(81 South. 677)
ALEXANDER et al. v. SMITH et al.
(3 Div. 212.)

(Supreme Court of Alabama. June 20, 1918. In Response to Application for Rehearing, April 17, 1919.)

1. ADVERSE POSSESSION ⬤➡85(2) — TIMBER TRESPASS — ACTIONS FOR PENALTIES — EVIDENCE—ADMISSIBILITY.

In an action for statutory penalty for destroying trees on land, title to which was claimed by plaintiffs by adverse possession, it was not error to admit in evidence a will as showing color of title and a bona fide claim to the land on defendants' part; the boundary, color of title, and description of the adjoining tracts being in dispute.

2. TRESPASS ⬤➡65 — TIMBER TRESPASS — ACTION FOR PENALTIES—DETERMINATION OF TITLE.

In an action for statutory penalty for destroying trees or saplings on land, the title to which was in dispute, where both parties claimed to be in possession when the timber was cut, the title and right of possession should not be attempted to be determined; the action being a penal transitory one.

3. JUDGMENT ⬤➡588—RES JUDICATA—ACTION FOR PENALTY FOR CUTTING TREES—TITLE TO LAND.

A judgment, in an action to recover the statutory penalty for cutting trees on disputed land, is no bar to a real action or one in the nature thereof to try title between the two parties.

In Response to Application for Rehearing.
4. TRESPASS ⬤➡67—TIMBER TRESPASS—PENALTY—QUESTIONS OF FACT—EVIDENCE.

In action for statutory penalty for cutting trees on a strip of land, evidence held to make the liability of the defendants a jury question.

Appeal from Circuit Court, Autauga County; W. W. Pearson, Judge.

Action by Charles Alexander and others against McQueen Smith and others to recover a penalty. Judgment for defendants, and plaintiffs appeal. Affirmed, and rehearing denied.

A. A. Evans, of Montgomery, for appellants.

Rushton, Williams & Crenshaw and Eugene Ballard, all of Montgomery, for appellees.

MAYFIELD, J. This was an action by appellants to recover the statutory penalty for destroying trees or saplings growing on certain land described as the west half of fractional section 35, township 17, range 16, in Autauga county.

The timber was cut or destroyed in clearing off and cleaning out an old ditch known as "Frenchman's ditch," often referred to in various deeds and mortgages through which both parties claim title to the lands; and it is claimed by the plaintiffs that the ditch forms the boundary line between their land and that of the defendants, and that the trees, saplings, and bushes cut by defendants were growing on plaintiffs' side of the ditch.

The ditch was cut to drain a pond known as "Cypress pond," located on the lands of both plaintiffs and defendants. It is not made certain when the ditch was originally cut, or by whom, whether by plaintiffs' or defendants' predecessors in title. It was cut long before either of these parties ever acquired an interest in the lands. It was, however, maintained by the defendants and their predecessors in title.

The defendants claim to own the whole of the ditch; that it is wholly on their land, notwithstanding it is mentioned in various deeds, wills, and mortgages as the boundary line between the two tracts of land owned respectively by the plaintiffs and the defendants.

The plaintiffs claim—and their theory is borne out by the descriptions in their chain of title—that they own the west half of the fractional section, and that the defendants own the east half thereof, and that the ditch is, and for many years has been recognized as, the boundary line. The defendants' contention is that they own the east two-thirds of the fractional section, and that the plaintiffs own only the west one-third

part thereof; that the calls of the deeds, as to the west half, are mere errors in description; that the legal title to the middle one-third, on which the ditch is located, never passed by the deeds; and that the title thereto has never been acquired, by adverse possession, under their color of title, by either the plaintiffs themselves or their predecessors in title—that the legal title to the ditch is in the defendants notwithstanding the various misdescriptions in plaintiffs' chain of title. The defendants also claim that, if they do not own the land on which the ditch is located, they and their predecessors in title have acquired a continuous easement in and to the ditch to drain their lands, and that the cutting away of the trees, saplings, and bushes was a necessary and proper use of the easement in order to drain the land.

On the other hand, the plaintiffs claim—and there is some evidence to show—that, if the legal title to the west bank of the ditch did not pass to them by virtue of the conveyances, then they and their predecessors in title have acquired title by adverse possession and prescription.

There was ample evidence to carry each of these questions and contentions of the defendants to the jury; and plaintiffs were not entitled to the affirmative charge as to the whole case, nor upon any one of the theories as to which such instructions were requested and refused. There was no evidence that the ditch was cut as a joint enterprise, or was maintained as such, although it was repeatedly referred to as the boundary line between the two tracts.

There are discrepancies in the description of defendants' chain of title. Some parts of the description would make the ditch the boundary line, while others would not—when referred to the area and quantity conveyed. In other words, their chain of title describes:

"All of fractional section 35, lying north and west of the Alabama river, except 189 acres off the west side thereof, which is now owned by John H. Carew, and is separated from the lands by a ditch, leaving 378 acres more or less in section 35 hereby conveyed."

If the plaintiffs acquired title by deed to only 189 acres, that excepted from defendants' chain of title, and the defendants acquired 378 acres, and plaintiffs or their predecessors in title have never acquired title by adverse possession, then the ditch is on the lands of the defendants and not on those of the plaintiffs. It follows that, if the title in this state and condition could be inquired into, the plaintiffs would not be entitled to the affirmative charge.

The question of easement and the proper use thereof was also a question for the jury.

[1] There was no error in admitting in evidence the will of Jacob Whetstone;

there being in the case a question as to disputed boundary lines, color of title, and discrepancies as to the descriptions of the two tracts of land. It was certainly admissible as color of title and bona fide claim of right, which, if established, is a defense to the action. Glenn v. Adams, 129 Ala. 189, 29 South. 836; Russell v. Irby, 13 Ala. 131; Postal Co. v. Lenoir, 107 Ala. 640, 18 South. 266; Williams v. Hendricks, 115 Ala. 277, 22 South. 439, 41 L. R. A. 650, 67 Am. St. Rep. 32.

The same is true as to other documentary evidence offered by the defendants and admitted by the court. Each was admissible as tending to show color of title and bona fide claim of right. If it could be said that they did not show or tend to show color of title in defendants to the land or trees in dispute, still they related to the subject-matter, and were the muniments of title under which defendants claimed title and right, and the case involved questions of disputed boundary lines and adverse possession, which rendered them admissible.

A party cannot successfully resist the admission of competent and relevant evidence offered by his adversary, though it fail to prove title or right in his adversary. If it be competent and relevant, it cannot be excluded, though it defeat the claim of the party offering it. We do not mean to intimate that such was the effect of this evidence, but merely hold that there was no error in admitting any of the documentary evidence.

[2] A close and repeated examination of this record with the aid of elaborate briefs of counsel for both sides, leads us to the inevitable conclusion that there is now, and was at the time the timber was cut, a bona fide claim of both parties to the land on which the timber was growing. Both parties were claiming to be in possession when the timber was cut or destroyed. This being true, the title and right of possession should not be attempted to be determined in a penal transitory action like this. This construction has always been placed on this and similar statutes. It has been repeatedly decided by this court that this penal statute does not give a right of action, even to the owner of the land, against one who is in possession under color of title and bona fide claim of ownership. The question was repeatedly brought to this court on several appeals, in the case of Long v. Cummings. On these appeals the authorities were reviewed and followed. On the first appeal it was said:

"Under this statute, it will be observed, the right of action is given to the owner of the lands; and it is wholly immaterial whether he was in possession at the time the cutting was done or not. Rogers v. Brooks, 105 Ala. 549, 17 South. 97; Gravlee v. Williams, 112 Ala. 539, 20 South. 952; Higdon v. Kennemer, 120 Ala. 193, 24 South. 439. But it is a valid de-

fense to the action that the defendant, when he cut the trees, did so under the honest belief that the land was his own. Postal Telegraph Co. v. Lenoir, 107 Ala. 640, 18 South. 266; Glenn v. Adams, 129 Ala. 189, 29 South. 836; White v. Farris, 124 Ala. 461, 27 South. 259, and cases cited in the opinions. In White v. Farris, supra, it is distinctly held that, the statute being strictly penal, it was not 'the intention and purpose of the Legislature, in its enactment, to give such penalty as against one in the actual adverse possession of the land under color of title bona fide claiming to own the same,'" Long v. Cummings, 156 Ala. 579, 47 South. 110.

On the second appeal it was said:

"The timber was cut openly, under claim of right. There is no evidence tending to show that the defendant cut the trees, knowing that the land belonged to plaintiff. The evidence does not show conclusively that the strip of land does belong to the plaintiff. In fact, as said by this court when this case was before it at a previous term: 'It is impossible to read the evidence set out in the record without reaching the conclusion that the real controversy between the parties is the location of the boundary line.' Long v. Cummings, 156 Ala. 577, 580, 47 South. 109, 110. The plaintiff failed to prove such a cutting as would authorize a recovery of the penalty provided by said section of the Code, under our decisions thereunder." Long v. Cummings, 165 Ala. 343, 51 South. 744.

On the third appeal (182 Ala. 507, 62 South. 517), the above excerpts were quoted and approved.

There is no dispute that both parties claim title to the land from which the timber was cut by defendants. The bona fides of defendants' claim was submitted to the jury under proper instructions, and they found for the defendants. We find no error that will justify us in the reversal of this judgment. What is said here, as to the title, claims and possession, of the parties as to the strip of land from which the timber was cut, is intended only for the trial of this personal, transitory, and penal action.

[3] It is needless to say that this judgment is no bar to a real action or one in the nature thereof to try titles between these two claimants as to this strip of land.

In the case of White v. Farris, 124 Ala. 461, 466, 27 South. 259, 261, it is said:

"Ownership of the land from which the trees are cut is made by the statute an essential element of the right of recovery of the penalty given. The title or ownership of the land must be averred in the complaint, and if denied or put in issue by the plea of the defendant it must be proven before any recovery can be had. The right to the penalty necessarily depends upon the title or ownership of the land, and it follows that the plaintiff's title to the land may become an issuable fact. But notwithstanding such an issue may become involved in the trial, the action is nevertheless a personal, transitory action. While the penalty given by the statute is based upon the idea and theory of a trespass committed, yet, unlike the actions of trover or detinue, for trees or timber which have been cut and severed from the freehold and converted, where actual or constructive possession of the land by the plaintiff must be shown before a recovery can be had, this statute, in terms, gives the owner of the freehold his remedy and right of action without proof of actual possession. While this is true, the statute being strictly penal in its nature, we do not think that it was the intention and purpose of the Legislature in its enactment to give such penalty as against one in the actual adverse possession of the land under color of title bona fide claiming to own the same. * * *

"In the case of Brooks v. Rogers, 101 Ala. 124 [13 South. 386], McClellan, J., speaking for the court, said: 'The cases of Cooper v. Watson, 73 Ala. 252, and Beatty v. Brown, 76 Ala. 267, are clearly distinguishable from this one, in that the defendants in those cases held adversely to the plaintiffs—a fact which is of controlling importance—and the recoveries sought involved trials of the conflicting claims of title which could not be adjudicated in these transitory actions.'" 124 Ala. 467, 27 South. 262.

"It is hardly reasonable to conclude that the Legislature intended by the enactment of this statute to impose a penalty upon one in adverse possession of the land under color of title, in good faith claiming to own the same. As we have stated above, in this action for the recovery of the penalty given by the statute, the title of the plaintiff to the land is of necessity involved in the suit, and the fact that his title may be controverted by the defendant will not prevent his recovery provided he sustains his averment of title or ownership, there being no conflicting claim of title set up; yet if the issues as made up under the pleadings involve a trial of conflicting claims of titles of the parties to the suit, and such as would arise out of the defense of an adverse possession by the defendant under color of title and bona fide claim of ownership, if such defense be sustained by the proof, the plaintiff would be defeated in his right of recovery of the penalty for trees cut by the defendant during such adverse possession and bona fide claim of ownership." 124 Ala. 468, 27 South. 262.

It follows that the judgment of the lower court must be affirmed.

Affirmed.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.

In Response to Application for Rehearing.

MAYFIELD, J. Counsel for appellants in applying for rehearing in this case has filed a printed brief of more than 100 pages—a copy of which he has furnished to each of the judges. In this brief the opinion is severely criticized, and counsel is so earnest and elaborate in his contention that the writer of the opinion "entirely misapprehended the case shown by the record," that we deem it necessary to respond to some extent to counsel's contention.

On page 65 of appellants' brief it quotes from the opinion, and then adds:

"The statement necessarily contradicts itself, because plaintiffs could not possibly claim the entire west half of fractional section 35, and also claim that Frenchman ditch is the boundary line between their plantation, known as the Carew place, and the plantation of the defendant McQueen Smith, known as the Reese plantation. The plaintiffs have never claimed, although their chain of title calls for it, any part of the west half of said section 35 that lies east of Frenchman ditch, and there is a strip about 350 feet wide of said west half which lies east of said ditch."

The land described in the complaint is as follows:

"A part of the west half of fractional section thirty-five (35) township seventeen (17), range sixteen (16), in Autauga county, Alabama, and constituting a part of the plantation owned by plaintiffs, commonly known as the Carew place."

Here is a claim in the complaint, a claim to land east of the ditch; nothing is said in the complaint as to that west of the ditch.

One of the plaintiffs testified to an agreement between his father and the defendant Smith as to building a line fence between them on the east side of the ditch, and that a fence was so built. In part, he said:

"My father went into possession of this land under the deed, already introduced in evidence, from Carrie F. Lum and her husband to my father, J. L. Alexander, of date December 10, 1900, immediately after said deed was executed, claiming it as his own. All the lands conveyed by said deed, of which the said west half of said section 35 was part, constituted one plantation and was known as the Carew place.

"There was at one time an agreement between my father and Mr. McQueen Smith that my father would furnish the wire and Mr. Smith would build therewith a fence between the lands of my father in said section and the lands of Mr. Smith. My father furnished the wire. My father and Mr. McQueen Smith were talking about that line here on Saturday afternoon. My father was dealing in wire at the time, selling the Pittsburg wire, and it came up in some way, and Mr. Smith said that he would build the fence, if my father would furnish the wire to build the fence between them, and my father agreed to it, and there was a fence built on the east side of Frenchman ditch. The fence went down the ditch nearly to the river."

January 23, 1913, just before suit was brought, this same plaintiff and witness wrote a letter to defendant relative to this matter, and plaintiffs introduced it in evidence. In part, it reads:

"Mr. McQueen Smith, Prattville, Ala.—Dear Sir: It has just come to our knowledge that you are widening and deepening the ditch on our Carew plantation, known as Frenchman's ditch. It is our understanding that you are aware that this ditch is entirely on our land. The ditch belongs to us."

Plaintiffs introduced another witness to corroborate this—one of the plaintiffs himself to show that the ditch was not the boundary line, but that one was agreed on east of the ditch. He testified, in part, as follows:

"I know Frenchman ditch. I know where it is. Mr. McQueen Smith told me while I was working for him, while he was cutting the Smith Alexander ditch, that he was sorry that he did not go out on the line between him and Mr. Alexander. * * * On Mr. Smith's side of the ditch there was a wire fence a part of the way; I don't know that it went all the way Mr. Smith said he put it there. He told me that he put it there. He said old man Alex furnished some of the wire and he did the work. He said it was between him and Alexander. My best recollection is that he said it was the line fence between them, or put there between them. I would not be positive as to what he said about its being the line fence. He said it was a fence between them; that old man Alex furnished the wire, and he did the work, is my recollection."

The record further shows as to the testimony of plaintiff:

"Witness further testified that when he said in the letter heretofore introduced in evidence, 'It is our understanding that you are aware that this ditch is entirely on our land,' I was going on the theory that Mr. Smith and my father had established the line between them on the east side of the ditch."

The plaintiffs' chain of title described the lands as "the west half of fractional section 35," and made no reference whatever to a ditch, as did defendants' chain of title. If these deeds passed title to the west bank of the ditch, they did to the east bank and the whole of the ditch. The undisputed evidence showed the ditch to be wholly within the west half of the fractional section. There is nothing in plaintiffs' chain of title to show that the ditch was the line. It is true, plaintiffs could not prove actual possession east of the ditch; but they did claim it, and offered much evidence to show constructive possession.

This record shows that plaintiffs had the legal title to the "west third" of fractional section 35, and color of title only to the "center third" on which the ditch was located. It also shows that the defendant Smith has the legal title to the "east third" of this fraction, and all the "center third" on which the ditch is located, unless the mention of this ditch in the chain of title from one Reese on down to him limited the title to the east side of the ditch. One Montgomery is shown to be the common source of title of both parties. From this common source the legal title to the "center

third" is shown to have passed into Reese, and that, if the description as to the quantity and the boundary as to the "west third" is to control, the legal title passed out of Reese to the Pratts, and from them to the defendant Smith. As before stated, however, if the mention of this ditch in these deeds limited the grant to the ditch, then the legal title so far as the paper title shows is yet in Reese, or his heirs. As a bona fide claim of title is sufficient to defeat this penal action, it is not necessary now to further construe those deeds. Defendants' chain of title purports to convey all of the fractional section which is 567 acres, except the "west third," which is 189 acres, and which is indisputably the lands of plaintiffs. This chain of title, after thus granting all the fractional section except 189 "acres" off the west side, says "leaving 378 acres more or less," thus showing an intention to convey the other two-thirds. Notwithstanding this repetition, this chain of title does say the lands are separated by a ditch; and, if the ditch be the one in question, then there was an error as to the acreage granted and accepted.

While it is true, as counsel contends, there was no actual pedis possessionis shown or attempted to be shown by plaintiffs east of the ditch, and none by defendants west of the ditch, except the acts of repairing and widening the ditch, yet there was a claim of title by plaintiffs east of the ditch, and of defendants west of the ditch by color of title and by fences placed on either side of the ditch. Plaintiffs' predecessor in title nor plaintiffs ever placed a fence on the ditch, but the former did place one some distance west of the ditch, and west of any of the trees or saplings cut.

Defendant testified that he never knew that plaintiffs ever claimed the ditch until he received the letter in question. He testified, in part, as follows:

"Before I got the letter introduced in evidence from Peyton Alexander, I had never heard that Col. John L. Alexander or any of his children after him claimed to own that ditch. No one had ever made any claim to the ditch since I had been there."

This surely would authorize the jury to infer that he did not know that they owned the banks of it, or the land on which it was located. Surely, he was not talking about the mere hole in the ground. If it was a line ditch, each would own to the center, and defendants would have known that plaintiffs had some claim to a part of it at least. It is true that parts of defendants' testimony tend to show that the ditch was a line ditch, and parts of it that the line was east of the ditch even. But considering it all, it was undoubtedly a question for the jury as to whether or not they had

a right to cut or destroy the timber they did in repairing, improving, and widening the ditch. Moreover, as stated in the original opinion, if the ditch was wholly on plaintiffs' land, or on that of both as a line ditch, the undisputed evidence showed that defendants and their predecessors in title have an easement in and to the ditch for the purpose of draining land and Cypress pond, which was partly on the land of both parties, and that they had exercised this right by repairing the ditch for more than 20 years before any objection was ever interposed by plaintiffs' predecessors in title. This repairing, of course, was not continuous, but was on at least two occasions—20 years apart—and at their will and without objection from plaintiffs' predecessors in title.

While it is true, as appellants claim, that the ditch was widened in places, and thus made to extend further west than theretofore, and in so doing destroyed the timber here complained of, the evidence certainly tended to show that it was not done recklessly, or wastefully, but was necessary and proper to make the ditch perform the services and functions for which it was intended, and for which easement gave them the right to have the ditch drain the land. Mr. Washburn thus states the law as to easements of ditches:

"If there has been the use of an easement for twenty years unexplained, it will be presumed to be under a claim of right, and adverse, and be sufficient to establish a title by prescription, and to authorize the presumption of a grant unless contradicted or explained.

"So where it has been used for twenty years or more under a claim of right, although such right were originally gained by an oral grant, such a user would be sufficiently adverse to gain a prescription thereby. * * *

"One ancient ditch connected with another still more ancient, by which the water accumulating upon a considerable tract of land flowed from the first into the second ditch, and thence into a natural stream. The two estates through which these ditches ran came into the same owner's possession. After a while he sold the lower parcel to the defendant's grantor, and then sold the upper to the plaintiff's grantor. The estates thus remained for more than twenty years, when the owner claimed the lower parcel stopped the ditch. The upper owner claimed a prescriptive right to maintain the same, and this right was sustained by the court."

Appellants now contend that the thing they complain of is the mode and manner of the repair by widening the ditch. The evidence certainly tended to show that widening it was necessary in order to give it the proper depth, and slope to drain the lands and pond intended thereby to drain, and which defendants had the right to do.

The evidence tended to show that the

work done by defendants in repairing this ditch was necessary and proper and done in a skillful manner. Among other things, it was testified by witness qualified to so testify, "I went up and down this ditch and made these measurements." Defendant asked witness the following question:

"'Did you see any evidence of any unskillful work there in the ditch, or anything that indicated that there was any unusual work done, such as would destroy any trees or saplings or other property of the landowners on the one side or the other of the ditch?' Witness answered: 'I did not see any unskillful work, and I saw no destruction of timber on one side or the other more than was consistent with the fact of cleaning off those ditch banks and opening and deepening the ditch.' Defendant then asked the witness the following question: 'Was there anything in that ditch, or in the surroundings there in October, 1913, which indicated that there had been any waste of trees, or undue amount of destruction of trees or saplings or undue amount of covering up the land with dirt that came out of the ditch—anything like that?' Witness answered: 'There was no evidence on the ground, so far as I could see, that the ditch was unskillfully built, or that trees or saplings alongside of the ditch were wastefully destroyed.'"

There was no evidence which conclusively showed that the ditch was unnecessarily widened or deepened, or that timber was unnecessarily or wantonly destroyed in repairing the ditch.

It should be remembered that plaintiffs at first denied any right to repair the ditch, and claimed the whole of the land on which it was located. It was only on a failure of proof to support this claim that it was abandoned. The letter written by one of the plaintiffs while the work was being done, which is above set out in part, did not complain alone of widening the ditch, or the manner in which it was being done, but denied all right to repair it, and claimed the act to be a trespass; and charged the defendant with knowlege that it was wholly on the lands of plaintiffs, and that "the ditch belonged to them," not a part of it as they now claim.

[4] Under the pleadings and evidence in this case, after another full review, we are of the opinion that the liability of defendants was a jury question, and we find no erroneous rulings as to evidence or charges, which were prejudicial to plaintiffs. As stated in brief of appellants, two juries have had the questions of liability submitted to them, and both failed to find defendants liable; and we find no sufficient reasons to reverse the judgment based on the verdict of the last.

It results that the application for rehearing is overruled and denied.